IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| MARIO NOYOLA, | ) | No. 39698-3-III |
| Appellant, | ) | |
| v. | ) | |
| WASHINGTON STATE DEPARTMENT OF CORRECTIONS, | ) | UNPUBLISHED OPINION |
| Respondent. | ) | |

FEARING, J. — Mario Noyola appeals a superior court ruling dismissing his Public Records Act (PRA), chapter 42.56 RCW, cause of action against the Department of Corrections (DOC) and a ruling enjoining Noyola from further public records requests. Because Noyola requested records that did not exist, we affirm the dismissal of his claim. We also affirm discovery sanctions imposed against Noyola. On de novo review, we reverse the injunction favoring DOC because it failed to establish harassment or the creation of a security threat by Noyola.

## FACTS

The pending appeal began as a PRA suit brought by Mario Noyola, a prisoner at Airway Heights Corrections Center (AHCC), against DOC. DOC filed a counterclaim against Noyola to obtain an injunction barring Noyola from further public records

requests. Noyola had sent a public records request to DOC that sought records of electronic messages between David Salmeron and himself through the DOC JPay messaging system and any records concerning DOC's handling of the messages.

JPay, Inc. is a private company that offers video calling, e-mail communications, and other digital services to incarcerated individuals through tablets. These tablets, running on a modified version of Android, lack direct internet access. A user, to download music and videos or send e-mail, must connect his or her tablet to designated kiosks within the prison.

DOC contracts with JPay, Inc. to provide Washington State prisoners with access to electronic messaging, among other services. DOC staff reviews prisoners' JPay messages to ensure compliance with department policy. Policy 450.100 authorizes staff to inspect incoming and outgoing mail to prevent criminal activity and the receipt or sending of material that threatens security and order within DOC facilities. If an incoming message contains barred content, DOC mailroom staff issues a rejection notice, through the JPay system, notifying both the sender and the incarcerated recipient of the rejection and its reasons. A prisoner may appeal the rejection by submitting a written notice within ten days. The prisoner may appeal the denial of the first appeal to DOC headquarters.

In 2017, Mario Noyola submitted a public records request to DOC for his phone logs and phone Personal Allowed Number (PAN) lists. The PAN list catalogues the phone numbers approved for inmate calls. At that time, other inmates at Coyote Ridge Corrections Center had engaged DOC in litigation on this subject.

In February 2018, Mario Noyola sent DOC a public records request for all records surrounding his classification process. An inmate's classification determines the level of security for the inmate's housing and the types of programs available to the inmate. DOC received similar requests from other inmates at the same time, which requests contained some of the key words inserted in Noyola's records request. The language arose from a DOC form made available to inmates. According to Mario Noyola, DOC encouraged inmates to review classification records. DOC asserts that Noyola filed a suit regarding his public records request for his classification records. DOC discloses to this court no information regarding this lawsuit.

Before the sending of the JPay messages relevant to this suit, Mario Noyola procured others to send him photographs through the DOC JPay system. According to Noyola, the photos received included photographs of women in various positions and in diverse clothing, including a bikini. Noyola insists that he allowed prisoner Sean Martin, a published artist, to view the photos on his JPay tablet. Martin values photos of women in swimwear because of the showing of musculature and the contours of the body.

Noyola does not explain why Martin could not procure photographs on his own. In his messages to the senders of the photographs, Noyola did not suggest he sought the photographs for others.

At an unknown date, Mario Noyola sent a request to Moses Lake School District for his daughter's school records. The school district wrongfully withheld records in response to the request. Noyola, represented by Richard Wall, filed suit against the school district. The school district settled with Noyola for $5,000. Jesus Salmeron, a former inmate in DOC custody, assisted Noyola by establishing an e-mail account, by which Noyola could communicate with attorney Wall. According to Noyola, Wall deemed e-mail the best form of communication between attorney and client. Noyola paid Salmeron for his assistance. Afterward, Noyola told Salmeron: "did you learn how to settle a lawsuit? Seems kinda easy huh?" Clerk's Papers (CP) at 594, 932.

On October 11, 2020, Mario Noyola sent a JPay message to the e-mail address of David Salmeron, the brother of his friend and former AHCC resident, Jesus Salmeron. The message communicated with Jesus, not David. DOC policy precludes an inmate from using another individual's JPay account but does not ban an inmate from communicating with a friend who uses another's JPay account. Noyola requested that Jesus forward him photos of women, including Salma Hayek, Kylie Jenner, and a Spokane television station newscaster. To prevent the photos from being rejected by

4

DOC mailroom staff, Noyola outlined, for Jesus, steps necessary to comply with DOC policy:

> send whatever ones you can find that are sexy or in bikinis or whatever. you know the kind I'm looking for. some that show a side shot of booty cause you know they don't allow full booty shots. if you can't find any then get what good ones you can. it sounds like a lot but just get what you can when you can. they should be easy to find if you Google them and do it on Google pics.

CP at 1164 (spelling and punctuation in original). This JPay message marked the beginning of a month-long exchange between Noyola and Jesus Salmeron, by which Noyola sought to procure photos of women.

Shortly after the October 11 message to Jesus Salmeron, Jesus sent Noyola photos through the JPay system. On October 21, 2020, Mario Noyola urged Jesus to continue sending images:

> Send the rest of the famous peeps and send a few side shots of Jael de par do and the other peeps too. good ones like you would want. were you able to get the one off the attorney website? anyway, start shooting them.

CP at 1164 (spelling and punctuation in original). Noyola avers that he intended to allow Sean Martin to see the photos for purposes of sketching.

On November 2, 2020, Mario Noyola received notice that DOC had intercepted eleven JPay messages as sexually explicit material. He then e-mailed Jesus Salmeron:

> Hey what type if pics did you send cause these fools said they are all sexually explicit. were they like the other ones? I'm definitely gonna

> appeal it cause I doubt they were anything bad.  keep sending what you can. but you know these fools don't allow back shots.  as long as they are covered then they should be good.

CP at 1167 (spelling and punctuation in original).  In a responding e-mail, Jesus Salmeron admitted that two of the forwarded photos might have been questionable but explained that he was testing the boundaries of DOC's judgment of sexually explicit content.  Jesus, however, insisted that all women in the photographs wore clothing or a bathing suit.  Noyola suspected that DOC mailroom staff had rejected all the photos because DOC deemed one and only one to violate policy.  Noyola reminded Salmeron:

> Remember they can be in bathing suits and stuff like that so its probably just some random working right now that's rejecting them.  were you ever able to get the pic of the attorney?

RP at 1168 (spelling and punctuation in original).

We cannot adjudge whether any of the intercepted photographs qualify as a security risk or qualify as sexually explicit in violation of DOC policy.  DOC never submitted the photographs to the superior court for in camera review.

As DOC continued to reject forwarded photographs, Mario Noyola concluded DOC rejected photos without cause:

> Now I know they [DOC mailroom staff] are just rejecting to do it cause I just got 3 more so send one of Camila fully clothed but dressed nice and see if they reject that one.  save what pics you have sent.  send them to my email so I have them for later cause I'm gonna need them to show the court. . . . see if you can look up doc policy 450.100 on doc's website and tell me what it says on how to appeal a jay email message that got rejected

6

and who I send it to cause I can't get to the law library till next week and I don't want to wait.

CP at 1168 (spelling and punctuation in original).

Jesus Salmeron considered photographing the DOC policy and sending it to Mario Noyola as a JPay attachment but hesitated for fear that mailroom staff might reject it as well. In a JPay message to Noyola, Jesus wrote:

> SALMERON: Hey you think they'll trip if I take a picture of the policy and send you the page where it talk [sic] about it?

Noyola responded:

> NOYOLA: yeah send the policy but try to cut and paste it to the email cause I'm not sure if a pic will be big enough to see it but do what's easiest…. see if you can send the other two pics. the one of the attorney and Katy.
> NOYOLA: that's perfect. don't worry about sending the policy in a pic cause what you sent will work. good looking out!
> NOYOLA: what's up fool? did you send some new pics cause I got a rejection today marked the 9th. (today) they have been saying its cause they have see through material, been showing buttocks, so anything like that they will reject so it can be a front shot or side shot I guess. send some of sue bird, Erin Andrews, molly yeh and Elizibath saint. they can be dressed nice or if you can find some in bikinis, either one. I'm drafting a letter for you to send to the attorney for me but I won't need it sent till Tues.or wed.this week.

Report of Proceedings (RP) at 1170 (spelling and punctuation in original).

On November 2, 2020, Mario Noyola sent by U.S. mail a public records request to DOC seeking "all records for the incoming JPay mail that was 'rejected' that was sent to inmate Mario Noyola #767684 (myself) from David Salmeron between the dates of

7

October 25, 2020, to the date you received this request." CP at 507, 975. He clarified,

"These are only requested for the timeframe above and associated with any rejection of

'incoming JPay messages' from the specified time and identified person(s)." CP at 507.

Note that Noyola sought records regarding JPay messages from David Salmeron, not

Jesus Salmeron. To repeat, Noyola had communicated, through the messages, with Jesus

on David's e-mail address.

DOC received Mario Noyola's public records request on November 9, 2020, and

assigned it to Public Records Specialist Heather Cody. DOC possessed eleven rejected

messages within the requested timeframe. In her initial five-day response letter pursuant

to RCW 42.56.520, Cody informed Noyola of DOC's anticipated date of response, but

inadvertently left the placeholder "Xx" unchanged in the form letter instead of inserting

the actual anticipated date. As of November 2020, Washington State Governor Jay

Inslee, because of the COVID-19 pandemic, had suspended RCW 42.56.520's

requirement that a government agency respond to a public records request within five

days.

On February 18, 2021, after several months of searching for records, DOC sent

Noyola a letter stating the cost for receipt of forty-nine pages of records. The records

comprised the rejection notices, screen shots showing staff involvement in the rejections,

and internal appeal documents. Noyola forwarded a money order and instructed DOC to send the records to attorney Richard Wall. DOC mailed the records as requested.

The records, however, did not include the messages or photos sent by Jesus Salmeron and intercepted by DOC.

On July 16, 2021, DOC headquarters reviewed the photo attachments previously intercepted and overturned one of the rejections. DOC concluded that "partially exposed buttocks" in a photograph showed "more of a side hip than a buttocks [sic]." CP at 410, 803. It notified Noyola of approval of release, but DOC never sent Noyola the photographs.

## PROCEDURE

On August 3, 2021, Mario Noyola sued DOC for violations of the PRA. He claimed that DOC violated the PRA by failing to place in its initial response letter a certain date for receipt of the requested records and by withholding the photographs confiscated by the AHCC mailroom staff. DOC filed a counterclaim, under RCW 42.56.565(2), seeking an injunction against Noyola from serving additional public records requests.

In August 2021, DOC sought to conduct a deposition of Mario Noyola. Noyola refused to submit to a deposition. On application by DOC, the superior court ordered Noyola to appear for a deposition. Thereafter, Noyola filed an objection to the order.

The court reviewed the objection and confirmed its ruling ordering Noyola to appear for a deposition. Noyola filed a motion for reconsideration. The superior court then entertained oral argument. The court denied the motion.

Mario Noyola refused to agree to a date for his deposition, so DOC unilaterally scheduled a deposition for May 2022. Noyola appeared for the deposition, but terminated the questioning under the auspices of CR 30(d). He then sought a protective order because of the harassment and annoyance imposed by DOC. The superior court compelled Noyola to sit for a deposition and answer in good faith. At the next deposition date, Noyola entered numerous objections. During a third deposition date, Noyola abruptly refused to answer, while stating: "I'm going to ask to have this put before the judge so that I can obtain an attorney because I want an attorney present for this deposition." CP at 915. Thereafter Noyola filed two motions for a protection order, each which the superior court denied.

In a September 29, 2022 deposition, counsel asked Mario Noyola, "But you could have said you were seeking messages from David Salmeron's account that were sent by Jesus Salmeron; correct?" CP at 876. Noyola objected to "the form of the question. It's argumentative," he intoned. CP at 876. When DOC counsel inquired as to whether Noyola would answer the question, Noyola told counsel to "repeat it one more time." CP at 877. Then, Noyola objected to the question as confusing based on the term "could

10

have" and asked counsel to rephrase. CP at 877. Next Noyola objected to the question as vague. Still later Noyola objected based on speculation and irrelevance. Finally, Noyola postured: "I'm refusing to answer that on the basis that you're mischaracterizing the evidence and the testimony." CP at 880.

During the September 29, 2022 deposition, DOC's counsel asked Mario Noyola why he submitted a public records request for communications between David Salmeron and himself when Noyola earlier asked Jesus Salmeron to preserve the messages:

> Q  I will repeat the question.
> If you had the ability to have access to the messages through Jesus Salmeron, why would you submit the public records request to get the same documents?
> A  There's — there's no reason. I mean, there's — I don't have an explanation for that. I'm not going to speculate.
> So whether or not he — he has the ability to do that or not, I don't know. I don't know if he has a printer. I don't know if he had anything else. I don't know if he's able to do that.
> So, if that's the case, I mean, you're asking me to speculate at this point.
> So, to even try to give an answer would be unfair to — to have me answer that because you're asking me to — to ask — or answer a question that deals with somebody else's actions.

CP at 488-89.

During the pendency of this suit, DOC conceded no intent to seek an injunction against Mario Noyola until he filed this suit. In an answer to a request for admission, DOC admitted its public records specialist did not inform Noyola of any safety or

security concerns in response to the public records requests. DOC asserted, however, that it placed Noyola on notice of "the concerns when it rejected the messages." CP at 748. DOC's answer to the request for admission does not identify how or who relayed these concerns to Noyola. The answer also fails to detail the purported concerns.

In support of DOC's summary judgment motion, DOC submitted a declaration of Tracy Schneider, a corrections manager with the department. Schneider oversees the inmate legal access and inmate mail. She testified that DOC rejects inmate electronic messages that present a risk to the DOC facility. According to Schneider, DOC does not allow an inmate to obtain rejected messages by later filing a public records request. Production of the message through a public records request would defeat the purpose of intercepting the message for safety reasons.

Tracy Schneider averred that Mario Noyola submitted a public records request for messages that DOC already restricted. Schneider's declaration does not indicate the reason for the interception of the messages. The declaration does not even expressly state that the messages caused safety or security concerns.

The superior court dismissed Mario Noyola's PRA suit. The court ruled that Governor Inslee's suspension of RCW 42.56.520 shielded DOC from any liability by reason of the department's initial letter that failed to insert a date for expected production of records. The court ruled that JPay messages did not constitute "public records" within

12

the meaning of the PRA because the messages do not concern any governmental

function. CP at 322. The superior court also found that David Salmeron never sent any

messages to Noyola. Noyola knew that only Jesus Salmeron communicated with him.

The superior court, in response to DOC's counterclaim, imposed, under RCW

42.56.565(2), a one-year injunction precluding Mario Noyola from submitting public

records requests to DOC. The court entered findings of fact supporting the injunction:

> 4. Both Mr. Noyola and Jesus Salmeron knew the pictures in question potentially violated the Department's guidelines regarding sexually explicit material;
> . . . .
> 6. Mr. Noyola received the automated rejection notices on November 2, 2020. Mr. Noyola asked Jesus Salmeron to save the messages to his e-mail that Jesus had sent him for litigation;
> . . . .
> 10. The Department has an internal appeals process for challenging the rejection of a JPay message. Mr. Noyola submitted his public records request before he finished that process. Mr. Noyola's public records request was an attempt to circumvent that process;
> 11. Mr. Noyola has heavily involved Jesus Salmeron in his own public records requests and prior litigation related to such requests. Mr. Noyola has paid Jesus Salmeron for his involvement in these prior requests. After Jesus Salmeron was released, Mr. Noyola asked Jesus to "do him favors" as part of working on Mr. Noyola's Public Records Act (PRA) cases;
> 12. Mr. Noyola has submitted requests for records that are similar to requests submitted by other incarcerated individuals in his suit. These requests from Mr. Noyola appear to be seeking records similar to requests that other incarcerated individuals have filed lawsuits about. These requests by Mr. Noyola appear designed to set up litigation. Mr. Noyola was aware of other litigation involving the Department and JPay messages at the time that he submitted this request;
> 13. Mr. Noyola has used the PRA as a means of personal profit;

14. Mr. Noyola has given evasive answers about the reasons behind his requests. Mr. Noyola's explanations are not credible. Mr. Noyola refused to answer many questions during his deposition.

CP at 976.

In addition to entering findings of fact, the superior court entered conclusions of

law in support of the injunction against Mario Noyola:

5. An inmate harasses an agency for purposes of RCW 42.56.565(2)(c)(i) when they make public records requests for the purposes of financial gain;

6. … The Department is entitled to an injunction under that statute once it has shown that Mario Noyola has requested records to harass the Department;

7. RCW 42.56.565(3) allows the Court to consider a range of factors to determine whether an incarcerated requester has submitted requests to harass an agency. These factors include but are not limited to (1) other requests by the requester; (2) the type of record or records sought; (3) statements offered by the requester concerning the purpose of the request; (4) whether disclosure of the requested records would likely harm any person or vital government interest; (5) whether the request seeks a significant and burdensome number of documents; (6) the impact of disclosure on correctional facility security and order, the safety or security of correctional staff, inmates, or others, and (7) the deterrence of criminal acitivity. The Court has considered these factors;

8. Actions stemming out of the PRA are meant to be dealt with efficiently and effectively to promote open government. The act was no meant for a "gottcha" claim. In asking Jesus Salmeron to send messages and "see what he can get through," Mr. Noyola and Jesus Salmeron were testing the system and planning to get the profit rolling. By trying to get the same pictures in a PRA request after they were rejected, Mr. Noyola submitted a request in which his intent was clearly for the purpose of harassing the Department and hopefully profiting from the PRA. This request as also a request that threatened the safety and security of the Department's facilities by trying to circumvent the Department's mail processes;

9.  The Department has met the requirements for a permanent injunction under RCW 42.56.565(2)(c)(i) and (ii).  The Department has demonstrated, by a preponderance of the evidence, that Mario Noyola submitted the request at issue in this lawsuit to harass the Department;

10.  The Department has also demonstrated, by a preponderance of the evidence, that fulfillment of the request for the rejected JPay messages would likely threat[en] the security of the Department's facilities.  Mr. Noyola's public records request for the rejected messages is an attempt to obtain the messages that were already screened and rejected by the Department.  Such a request is an attempt to circumvent the Department's mailroom process.

CP at 977-78

LAW AND ANALYSIS

On appeal, Mario Noyola compiles forty-seven assignments of error.  We refine those assignments into five assignments.  First, the superior court erred when ordering Noyola to submit to a deposition.  Second, the superior court erred when imposing sanctions on him for failing to submit to a deposition.  Third, the superior court should have ruled that DOC violated RCW 42.56.520 by failing to insert an anticipated date of production in its initial response to the public records request.  Fourth, the superior court erred when dismissing his public records act cause of action.  Fifth, the superior court erred when issuing an injunction barring him from public records requests to DOC for one year.  We address these assignments of error in such order.

No. 39698-3-III,
*Noyola v. Department of Corrections*

Order for Deposition

Mario Noyola claims DOC and the superior court denied him due process when the superior court ordered him to appear for a deposition. He fails to identify any liberty interest in being free from a deposition when he files a civil suit.

Mario Noyola complains DOC failed to give him sufficient notice when the department applied for an order compelling his attendance at a deposition. Nevertheless, under CR 30(a), a court may grant leave to depose a party whether notice is given or not. Anyway, the superior court afforded Noyola an opportunity to respond and entertained oral argument when Noyola sought reconsideration. When a party had actual notice and time to prepare to meet the questions raised by the motions of the adversary, deviation from the time limit may be permissible. *Loveless v. Yantis*, 82 Wn.2d 754, 759, 513 P.2d 1023 (1973). Noyola forwards no argument that he could have, but did not, raise an argument in opposition to the conducting of a deposition that he could have raised if given additional time.

Sanctions

Mario Noyola next objects to the sanctions imposed on him as a result of his gamesmanship when refusing to submit to a deposition and then evading questions asked during depositions. We have outlined Noyola's conduct in response to DOC's attempts to conduct a deposition and obtain answers to legitimate questions. We affirm the

16

sanctions imposed by the superior court. Noyola violated CR 30(h)(3) by his refusal to answer questions. A party cannot unilaterally limit the scope of his deposition. *Johnson v. Jones*, 91 Wn. App. 127, 134, 955 P.2d 826 (1998). The superior court did not abuse its discretion when imposing sanctions. *T.S. v. Boy Scouts of America*, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006).

## PRA Claim: Initial Letter

RCW 42.56.520 theoretically demands government agencies to promptly respond to public records requests. Subsection one of the statute demands that the agency respond, within five business days, to a request by: providing the record, supplying an internet address and a link to the agency's website where the requester may access the records, furnishing a reasonable estimate of the time needed to locate and produce the records, asking for clarification of the request, or denying the request. When responding to Mario Noyola's November 2021 request, DOC chose option three except that, when sending Noyola the form letter, DOC failed to insert a date. Instead, the letter to Noyola contained the "x"s found in the department's exemplar.

We reject Mario Noyola's appeal based on RCW 42.56.520 because of a pause in the operation of the statute during the COVID-19 epidemic. On March 24, 2020, Proclamation by Governor Jay Inslee, No. 20-25.4, suspended the operation of RCW 42.56.520(1). https://governor.wa.gov/sites/default/files/2023-01/20-25.4%20-

No. 39698-3-III,
*Noyola v. Department of Corrections*

%20COVID-19%20Safe%20Start.pdf [https://perma.cc/4HY6-S2CM]. In May 2020,

while extending the proclamation that suspended RCW 42.56.520(1), the Governor

modified the suspension to omit requests received electronically. Mario Noyola sent his

request by U.S. mail, not e-mail.

PRA Claim: Failure to Produce

On appeal, DOC asserts that this court may affirm the superior court's dismissal of

Mario Noyola's PRA cause of action on three grounds. First, DOC possessed no

communications between Noyola and David Salmeron. Second, the JPay system records

do not qualify as "public records" under the PRA. Third, even assuming DOC retained

records responsive to Noyola's request, DOC conducted an adequate search for those

records. We affirm based on DOC's first argument.

An agency does not violate the PRA by failing to produce documents

unresponsive to a PRA request. *Dotson v. Pierce County*, 13 Wn. App .2d 455, 467, 464

P.3d 563 (2020). Mario Noyola demanded production of "all records for the incoming

JPay mail that was 'rejected' that was sent to inmate Mario Noyola #767684 (myself)

*from David Salmeron. . . .*" CP at 504-05 (emphasis added). The superior court found,

based on Noyola's testimony that David sent no messages to Noyola. Instead, Jesus

Salmeron sent all messages through David's e-mail account.

18

When I employ a florist to use its delivery truck to transport flowers to my wife, common usage of the English language does not deem the florist as the sender of the flowers. The florist acts as the vendor and deliverer of flowers. I remain the sender.

Injunction Standard of Review

The focal question on appeal concerns the propriety of an injunction against Mario Noyola that bars, for one-year, additional public records request directed at DOC. Before discussing the grounds for an injunction, we must resolve the important query of the level of review to attach to the superior court's grant of the injunction. The parties dispute whether this court reviews the superior court decision to issue its injunction de novo or under an abuse of discretion standard. Because the superior court did not entertain live testimony, we conclude we employ de novo review even of the facts.

The governing statute, RCW 42.56.565, authorizes an injunction against a prisoner from further public records requests if the governing agency establishes one or more circumstances. We will quote the substantive portion of the statute later. The statute also outlines the procedure to obtain an injunction:

> (2) The inspection or copying of any nonexempt public record by persons serving criminal sentences in state, local, or privately operated correctional facilities may be enjoined pursuant to this section.
> . . . .
> (4) The motion proceeding described in this section shall be a summary proceeding based on affidavits or declarations, unless the court orders otherwise. Upon a showing by a preponderance of the evidence, the court may enjoin all or any part of a request or requests. . . .

19

The language in subsection (4) requiring a summary proceeding and authorizing a review only of declarations controls whether we review the superior court's decision de novo.

The PRA contains a second injunction section in addition to RCW 42.56.565. This second statute, RCW 42.56.540, authorizes the subject of a public records request to obtain an injunction precluding the government agency from fulfilling the request if a statutory exemption applies to the record. The statute reads, in part:

> The examination of any specific public record may be enjoined if, upon motion and affidavit by an agency or its representative or a person who is named in the record or to whom the record specifically pertains, the superior court for the county in which the movant resides or in which the record is maintained, finds that such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital governmental functions. . . .

RCW 42.56.540 mentions the filing of an affidavit at the time of filing the motion for an injunction. Nevertheless, the statute does not expressly direct the superior court to undertake a summary procedure. RCW 42.56.565, our controlling statute, does.

Washington courts have generally held that appellate review of superior court decisions issuing or denying an injunction under the PRA receive de novo review. *Does 1, 2, 4, & 5 v. Seattle Police Department*, 4 Wn.3d 343, 359, 563 P.3d 1037, (2025); *Lyft, Inc. v. City of Seattle*, 190 Wn.2d 769, 791, 418 P.3d 102 (2018); J*ohn Doe A. v. Washington State Patrol*, 185 Wn.2d 363, 370-71, 374 P.3d 63 (2016); *King County*

20

*Department of Adult & Juvenile Detention v. Parmelee*, 162 Wn. App. 337, 351, 254 P.3d 927 (2011); *Progressive Animal Welfare Society (PAWS) v. University of Washington*, 125 Wn.2d 243, 252-53 (1994); *Spokane Police Guild v. Washington State Liquor Control Board*, 112 Wn.2d 30, 35, 769 P.2d 283 (1989); *Service Employees International Union Local 925 v. Freedom Foundation*, 197 Wn. App. 203, 212, 389 P.3d 641 (2016); *Dragonslayer, Inc. v. Washington State Gambling Commission*, 139 Wn. App. 433, 441-42, 161 P.3d 428 (2007), *overruled on other grounds by Service Employees International Union Local 925 v. Department of Early Learning*, 194 Wn.2d 546, 450 P.3d 1181 (2019). Nevertheless, when digging deeper into PRA cases, one discovers that the appellate standard of review depends on whether the superior court conducted an evidentiary hearing or only reviewed declarations and other documents regardless of the statute under which the applicant seeks an injunction.

On the one hand, de novo appellate review follows from the superior court examining agency action solely on a documentary record. *O'Connor v. Department of Social & Health Services*, 143 Wn.2d 895, 904, 25 P.3d 426 (2001); *Amren v. City of Kalama*, 131 Wn.2d 25, 32, 929 P.2d 389 (1997); *PAWS v. University of Washington*, 125 Wn.2d 243, 252 (1994); *Daines v. Spokane County*, 111 Wn. App. 342, 346, 44 P.3d 909 (2002); *Ockerman v. King County Department of Developmental and Environmental Services*, 102 Wn. App. 212, 216, 6 P.3d 1214 (2000). The de novo rule extends from the

observation that, when the record consists solely of affidavits, memoranda of law, and other documentary evidence, the appeals court stands in the same position as the trial court. *Pilloud v. Employment Security Department*, 33 Wn. App.2d 644, 566 P.3d 124, 129 (2025); *Ekelmann v. City of Poulsbo*, 22 Wn. App.2d 798, 805, 513 P.3d 840 (2022); Jo*hn Doe A. v. Washington State Patrol*, 185 Wn.2d 363, 371, 374 (2016); *Robbins, Geller, Rudman & Dowd, LLP v. State*, 179 Wn. App. 711, 719–20, 328 P.3d 905 (2014). In the event the superior court did not receive live testimony, the court's findings of fact do not bind the appellate court. *Robbins, Geller, Rudman & Dowd, LLP v. State*, 179 Wn. App. 711, 720, 328 P.3d 905 (2014). When the superior court does not entertain live testimony, the appeals court may decide anew both issues of fact and law. *Robbins, Geller, Rudman & Dowd, LLP v. State*, 179 Wn. App. 711, 720 (2014); *Dragonslayer, Inc. v. Washington State Gambling Commission*, 139 Wn. App. 433, 441-42 (2007); *Ames v. City of Fircrest*, 71 Wn. App. 284, 292-93, 857 P.2d 1083 (1993).

In *Spokane Police Guild v. Washington State Liquor Control Board*, 112 Wn.2d 30, (1989), the Washington Supreme Court examined the former RCW 42.17.330, the predecessor to RCW 42.56.540. The court observed that the statute did not expressly establish de novo review on appeal. Nevertheless, the statute directed the superior court to entertain a request for an injunction by reviewing affidavits and documents. The superior court had not heard testimony, had not assessed the credibility or competency of

witnesses, had not weighed the evidence, and had not reconciled conflicting evidence when reaching a decision. Thus, the appellate court stood in the same position as the trial court in reviewing the record. The Supreme Court held that appellate review would be de novo and further ruled that the superior court's findings of fact did not bind it.

On the other hand, when a trial court hears live testimony and judges the credibility of the witnesses, appellate courts consistently afford deference to its determinations of fact. *Zink v. City of Mesa*, 140 Wn. App. 328, 337, 166 P.3d 738 (2007). The appellate court reviews the trial court's findings of fact based on a testimonial record to determine if substantial evidence supports them. *PAWS v. University of Washington*, 125 Wn.2d 243, 252-53 (1994); *Zink v. City of Mesa*, 140 Wn. App. 328, 336-37 (2007).

*Washington Public Employees Association v. Washington State Center for Childhood Deafness & Hearing Loss*, 194 Wn.2d 484, 450 P.3d 601 (2019) runs askew from other Washington Supreme Court rulings about injunctions in PRA suits. The Supreme Court wrote that whether requested records are exempt from disclosure presents a legal question reviewed de novo. Nevertheless, according to the Supreme Court, the appellate court reviews a trial court's ultimate decision on whether to grant an injunction "for abuse of discretion." 194 Wn.2d at 492. When announcing the abuse of discretion standard, the Supreme Court cited *Kucera v. Department of Transportation*, 140 Wn.2d

200, 209, 995 P.2d 63 (2000). But *Kucera* is not a PRA decision. It entails an injunction under general principles of law. The superior court in *Kucera* conducted an evidentiary hearing.

Injunction Grounds

We now review de novo whether an injunction should be entered against Mario Noyola enjoining him from further public records requests from DOC for one year.

The PRA is a strongly worded mandate for broad disclosure of public records. *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978). The act requires all state and local agencies to make any public record available for public "inspection and copying" on request, unless the record falls within certain specific exemptions. RCW 42.56.070(1); RCW 42.56.080. The policy behind this law is that "free and open examination of public records is in the public interest." *Neighborhood Alliance of Spokane County v. Spokane County*, 172 Wn.2d 702, 715, 261 P.3d 119 (2011). To promote this policy, the PRA is to be "liberally construed and its exemptions narrowly construed." RCW 42.56.030.

In 2009, the Washington State Legislature enacted RCW 42.56.565, our governing statute, to curb abusive public records requests by individuals serving criminal sentences. Subsection (1) of the statute denies a prisoner, who prevails in a PRA suit, penalties against a government agency unless the prisoner establishes a bad faith response by the

agency.  Subsections (2) through (4) of the statute, those sections at issue in this appeal,

address injunctions restraining a prisoner for public records requests.  Those lengthy

subsections declare, in pertinent part:

> (2) The inspection or copying of any nonexempt public record by persons serving criminal sentences in state, local, or privately operated correctional facilities may be enjoined pursuant to this section.
> (a) The injunction may be requested by: (i) An agency or its representative. . . .
> . . . .
> (c) In order to issue an injunction, the court must find that:
> (i) The request was made to harass or intimidate the agency or its employees;
> (ii) Fulfilling the request would likely threaten the security of correctional facilities;
> (iii) Fulfilling the request would likely threaten the safety or security of staff, inmates, family members of staff, family members of other inmates, or any other person; or
> (iv) Fulfilling the request may assist criminal activity.
> (3) In deciding whether to enjoin a request under subsection (2) of this section, the court may consider all relevant factors including, but not limited to:
> (a) Other requests by the requestor;
> (b) The type of record or records sought;
> (c) Statements offered by the requestor concerning the purpose for the request;
> (d) Whether disclosure of the requested records would likely harm any person or vital government interest;
> (e) Whether the request seeks a significant and burdensome number of documents;
> (f) The impact of disclosure on correctional facility security and order, the safety or security of correctional facility staff, inmates, or others; and
> (g) The deterrence of criminal activity.
> (4) The motion proceeding described in this section shall be a summary proceeding based on affidavits or declarations, unless the court

> orders otherwise.  Upon a showing by a preponderance of the evidence, the court may enjoin all or any part of a request or requests. Based on the evidence, the court may also enjoin, for a period of time the court deems reasonable, future requests by:
>       (a) The same requestor; or
>       (b) An entity owned or controlled in whole or in part by the same requestor.
>       (5) An agency shall not be liable for penalties under RCW 42.56.550(4) for any period during which an order under this section is in effect, including during an appeal of an order under this section, regardless of the outcome of the appeal.

When addressing a motion for an injunction under RCW 42.56.565, we apply the PRA standard for an injunction, not the standard applied generally under CR 65.  *Lyft, Inc. v. City of Seattle*, 190 Wn.2d 769, 796 (2018).

The broad categories, under which RCW 42.56.565 authorizes an injunction, include harassment of the agency, a threat to the safety or security of anyone, or assistance in criminal activity.  DOC relies on categories one and two in this appeal. When determining whether the evidence satisfies one of the three broad categories, the court may consider any relevant factor, which may include other requests by the requestor, the type of records sought, statements offered by the requestor concerning the purpose for the request, any harm to a person, any threat to a person's safety, any harm to a governmental interest, the number of documents sought, and any criminal activity.  The statute does not hint at what factors could be irrelevant.  RCW 42.56.565 admits no instruction on how to weigh the factors.

a. Harassment

We analyze separately whether Mario Noyola engaged in harassment of DOC from whether he threatened the safety of another. We would affirm the injunction if DOC satisfied either of the two broad grounds. DOC bears the burden of proving circumstances substantiating an injunction. RCW 42.56.565(4).

The only Washington reported decision on issuance of an injunction under RCW 42.56.565 is *Department of Corrections v. McKee*, 199 Wn. App. 635, 399 P.3d 1187 (2017). The decision provides insights into whether Mario Noyola's request constituted harassment. *McKee* benefits Mario Noyola because of the stark contrast between Noyola's requests and behavior and McKee's requests and conduct.

Since 2006, inmate Jeffrey McKee submitted at least 336 requests to DOC, including 61 requests between December 2014 and February 2016. In late 2008 and early 2009, McKee sent five separate requests for records relating to DOC's contract with a private Arizona prison, four of which he sent on the same day. DOC previously incarcerated McKee in prison. One month later, McKee again sent multiple requests on the same day. In 2011, McKee submitted 60 records requests to DOC. In 2012, he submitted 79. In 2013, he submitted 51. One day, he submitted three separate requests seeking every public records request received by DOC for three different months. He

also requested records relating to the women he had raped at gunpoint. He requested records related to any investigation of his former Arizona cellmate, Matthew Silva.

Jeffrey McKee filed lawsuits against DOC related to his PRA requests in Franklin County, Spokane County, Thurston County, and in federal court. McKee employed his sister's company, Paralegal Services of Washington, to facilitate his lawsuits and PRA activity. In 2011, DOC settled three of the lawsuits with McKee for $9,500. By 2013, McKee was the plaintiff in 12 active PRA lawsuits against DOC. In November 2013, DOC and McKee entered into another settlement agreement. As part of the agreement, DOC agreed to pay McKee $80,000. In exchange, McKee agreed to dismiss the 12 pending lawsuits, withdraw his outstanding PRA requests, not request any records created prior to the agreement, and refrain from submitting any other requests for one year. McKee also agreed to not submit requests through third parties during this one-year period.

By 2013, Jeffrey McKee's former cellmate, Matthew Silva, had been released from prison and was living in Shoreline. In December 2013, shortly after entering into the settlement agreement, McKee attempted to mail two letters to Silva's address in Shoreline. Mailroom staff at the prison screened these letters and brought them to DOC's attention. In the first letter, McKee proposed having a recently released former inmate file PRA requests, so there would be no bad faith requirement when they file suit. He

28

also proposed having this person request inmate news media, as "News Media are some of the higher PRA payouts," which would lead to profit. He also wrote he would try to get the prison to issue him infractions and put him in segregation, which will create more PRA suits. He suggested contacting other individuals to pitch the idea of us litigating PRA suits through them. McKee also suggested starting a paralegal company so inmates could charge money for copies. McKee further stated he "just did a PRA suit for this guy over his central file records." He discussed discovery practices and negotiation tactics to generate larger settlement offers. He disclosed that he would request a discovery conference and tell DOC he intended to depose witnesses, which usually prompted a settlement offer. He gave Silva instructions to request prison telephone logs and stated that, "You should make some quick cash on this PRA case." He also gave instructions to request inmate central files, while adding that DOC would "withhold your FBI/WSP Rap Sheets which you are entitled to. That is what Chester won $100,000 for and Adams won $25,000.00 for."

Jeffrey McKee's second letter to Matthew Silva echoed the first letter. McKee stated he had an excellent case involving prison telephone logs. He described how he had requested the records relating to DOC's contract with the private Arizona prison, and then settled for $20,000 within three months. He gave instructions to make these requests "[t]hen sue them under the PRA. It should bring you some quick cash."

During the one-year period following the settlement agreement, Jeffrey McKee encouraged others to submit PRA requests and to sue DOC over those requests. He instructed his sister how to request the prison telephone logs. When DOC denied the sister's request, McKee instructed her how to appeal and told her the proper language to use in the appeal documents. He also instructed her to file a lawsuit, which she did.

Jeffrey McKee assisted other individuals with requests and lawsuits relating to the prison telephone logs. In early 2014, DOC received PRA requests from at least seven different Coyote Ridge Correction Center inmates relating to the telephone logs. Multiple inmates filed lawsuits. The complaints, interrogatories, and requests for production in those lawsuits were identical to filings in McKee's lawsuits.

In a deposition, one of the Coyote Ridge inmates acknowledged that Jeffrey McKee told him about the prison telephone logs, sending a PRA request, and filing a lawsuit. The inmate further acknowledged McKee helped him submit the request and drafted the lawsuit complaint. This inmate agreed to pay McKee if his lawsuit was successful. One of McKee's former cellmates, Karl Tobey, started a paralegal company after being released from prison. Inmates employed this company to copy documents for their lawsuits. The inmates then file cost bills to recoup these expenses, seeking amounts between $378 and $1,911.

In November 2014, the one-year period, in which Jeffrey McKee could not submit PRA requests, expired. McKee then requested to inspect his central file and also requested all records in his offender file pursuant to the classification notice/appearance waiver. DOC asked him to clarify his request. He never responded and filed a lawsuit. On December 1, 2014, DOC received two requests from McKee. He sought all telephone logs from his inmate account since 2011. He also sought his risk assessments, which were at issue in another inmate's PRA lawsuit against DOC. On December 5, DOC received four more requests from McKee. Between December 2014 and December 2015, McKee submitted 54 requests, many of which he submitted in batches on the same day. In one request, he sought "all communications between [the Department] and its employees to or from the Washington State Legislature and/or its agents or employees regarding prison inmates and the Public Records Act between 2005 and 2015." DOC staff spent over 18 hours on this request. In another request, he sought "investigation packets related to any investigation of any Coyote Ridge Corrections Center (CRCC) staff, employee and/or contract staff for any allegations of any type of misconduct from 11/21/13 to 4/23/15." DOC staff spent over 12 hours on this request. In December 2015, DOC had 12 pending requests from Mr. McKee. By February 2016, Mr. McKee had sent the Department at least 336 records requests in total.

The superior court, in *McKee v. DOC*, denied DOC's request for an injunction against Jeffrey McKee because McKee did not ask for any private information of DOC employees. This court reversed while ruling that RCW 42.56.565 allows an injunction in expanded circumstances. This court followed the principle of construing statutory language by using the ordinary meaning. The court focused on the statutory word "harass." According to this court, "harass" is defined as "to worry and impede by repeated attacks . . . to tire out . . . to vex, trouble, or annoy continually or chronically." Webster's Third New International Dictionary 1031 (1993). The plain meaning of this word indicates this provision applies when an inmate submits multiple records requests that impede, tire, vex, trouble, or annoy an agency.

We conclude that DOC has failed to show by a preponderance of evidence that Mario Noyola engaged in harassment. According to DOC, Noyola, and his friend Jesus Salmeron, intended to test the DOC system of screening JPay messages. DOC emphasizes Noyola's message encouraging Salmeron to continue to send photos to "see what happens." Salmeron responded that he knew some of the pictures were "risky" but he "wanted to see what would go through." DOC adds that, after scheming to assay the extent to which DOC would allow provocative photos, Noyola sought to test DOC further by a public records request for the same messages and photographs.

32

Under the lay definition of "harassment" and the teachings of *McKee v. DOC*, harassment constitutes repeated public records requests that impede, tire, annoy, or trouble DOC. Harassment might include a prisoner testing the system, but such testing should be repetitive and unjustified before meriting an injunction. Although Noyola asked Jesus Salmeron to send photos of women more than one time, Noyola only sent one public records request on this subject. Noyola did not send unending requests as did Jeffrey McKee. DOC presented no evidence of Noyola tiring its employees. DOC presented no evidence of the expense in responding to Noyola's request, let alone an exorbitant expense.

DOC does not support with law its implied argument that an inmate, who seeks to test the mail policy of DOC, necessarily engages in harassment. An inmate's testing of the system can lead to desirable results.

DOC argues that submitting public record requests for messages already deemed to violate DOC policy must be deemed harassment. This argument bleeds into DOC's argument that Mario Noyola sought to test DOC policy. Imprisoned journalists have used similar tactics to investigate whether DOC fails to address security concerns arising from prisoners in Sex Offender Treatment & Assessment Program (SOTAP) having access to sexually explicit content through JPay. Jeremiah Bourgeois, *Prison Dilemma: When Profit Undermines Safety*, THE CRIME REPORT (June 29, 2016); Jeremiah

33

No. 39698-3-III,
*Noyola v. Department of Corrections*

Bourgeois, *Becoming a Whistleblower in Prison is a 'Risky Business'*, THE CRIME REPORT (Jan 11, 2017).

DOC also has been a party to PRA litigation on the topic of interception of mail. Other prisoners and their family members objected to DOC's policies and practices regarding sexually explicit content and the appeal process. Mail-related issues are among the most frequent complaints received by the Office of Corrections Ombuds (OCO). Mail: Negotiated Outcomes, OFFICE OF THE CORRECTIONS OMBUDS (Aug. 11, 2022). By mid-2020, the OCO had nearly 100 open investigations concerning mail, with the majority involving reports of unfair rejections, processing delays, unclear guidelines, and allegations of mailroom staff misconduct.

On September 10, 2021, prisoners and family members filed a lawsuit against DOC, alleging violations of mail policy concerning both written letters and e-messages sent through JPay. *Bauer v. Washington Department of Corrections*, USDC (W.D. Wash.), No. 2:21-cv-00453. The complaint asserted claims under the First and Fourteenth Amendments, including an equal protection challenge to the rejection of photos of clothed women as sexually explicit while permitting images of nearly nude men. The lawsuit also alleged that DOC used its control over the mailroom to prevent inmates from communicating complaints and grievances about prison conditions to individuals outside the facility.

On November 1, 2023, DOC settled the federal court lawsuit and agreed to revise its Rejection Notice Form and update sections of its mail policy 450.100. The revised rejection notice and mail policy provide clear instructions for filing appeals and specific definitions of what constitutes sexually explicit material. The updated policy also prohibits DOC from using mail rejections as a form of retaliation.

DOC highlights that Jesus Salmeron used his brother David Salmeron's JPay account to communicate with Mario Noyola in violation of the policy prohibiting third-party use. Nevertheless, this policy only applies to an inmate using another's JPay account. Jesus Salmeron was not subject to DOC rules. DOC presents no evidence of Noyola being sanctioned for using another's account.

DOC highlights Mario Noyola's history in PRA litigation and his solicitation of another in order to further his litigation goals. In response, Noyola explains that he asked Jesus Salmeron to open an e-mail account because Richard Wall, the attorney representing Noyola in the school district litigation, desired to communicate with Noyola through e-mail. In turn, Noyola paid Salmeron only a nominal amount for his assistance.

DOC underscores that, during Mario Noyola's deposition, Noyola could not explain why he needed to submit a public records request for messages with Jesus Salmeron when Noyola had earlier asked Salmeron to save the messages. As part of his answer, however, Noyola added that he did not know if Jesus Salmeron had a printer.

DOC accentuates that Mario Noyola sent other public records requests to DOC. But DOC only identifies two other requests. One request sought phone records and a list of individuals that DOC approved for calls. The other request sought records concerning Noyola's inmate classification. DOC does not characterize either of these requests as illegitimate or as harassment. DOC supplies no facts that Noyola financially benefitted from any public records request directed at DOC.

DOC highlights that Mario Noyola previously submitted requests resembling requests of Jeffrey McKee that became the subject of *Department of Corrections v. McKee*, 199 Wn. App. 635 (2017). The requests sought an inmate's central file that includes classification data. A prisoner's classification determines where DOC houses the prisoner. One prisoner advocate criticized this classification system. J.D. Dew, *Performance Audit of the Inmate Classification Program Administered by the Department of Corrections*, NATIONAL INSTITUTE OF JUSTICE (1993). DOC may view prisoners' collaboration on public records requests sharing a common nexus to collective grievances as a conspiracy to undermine security or harass the DOC. An outside observer might, however, adjudge this collaboration as a necessary measure to gather records about a flawed system that governs prisoner's liberty.

DOC underscores that Mario Noyola lives in the same unit as other prisoners who have brought PRA lawsuits. DOC suggests that Noyola collaborates with these inmates

36

to collect penalties. Nevertheless, DOC provides no timeline of events to support this insinuation. DOC identifies no other inmates, or the requests submitted.

DOC emphasizes that Mario Noyola has been party to other PRA suits. DOC provides few details of these lawsuits. DOC does not disclose the outcome of a lawsuit Noyola purportedly brought as a result of the public records request for his inmate classification.

DOC characterizes Mario Noyola as a seasoned PRA profiteer who garnered $5,000 in a case against the Moses Lake School District. We assume Moses Lake School District settled because it violated the PRA such that Noyola's receipt of money was earned. We exclude Noyola's settlement against Moses Lake School District from our calculation of Noyola as a profiteer. Counsel represented Noyola in the suit. Under RPC 3.1, an attorney must possess a valid, factual and legal basis for any claim before filing the suit. Additionally, RPC 4.4(a) prohibits attorneys from using means with no substantial purpose other than to harass or burden a third party.

DOC accuses Mario Noyola of being more interested in litigation than obtaining the withheld records because Noyola did not avail himself of all the avenues of appeal within DOC. The superior court found, in finding of fact 10, that Noyola sought to circumvent the process of appealing by quickly filing suit. We do not consider this fact important. A prisoner has no obligation to exhaust administrative remedies before

seeking relief under the PRA. *Kilduff v. San Juan County*, 194 Wn.2d 859, 872, 453 P.3d 719 (2019).

We recognize that a government agency may obtain an injunction for conduct less egregious than the conduct of Jeffrey McKee. Nevertheless, the behavior of Jeffrey McKee in *McKee v. Department of Corrections* illustrates what Mario Noyola's conduct was not. Unlike McKee, Noyola has not submitted scores of public records requests. The record shows only two requests to DOC and one to the Moses Lake School District. DOC presented no evidence of Noyola encouraging others to submit public records requests or filing suits. Noyola has recovered no penalties from DOC. In short, DOC presented weak, and perhaps nonexistent, evidence that Noyola has harassed it.

### b. Safety

RCW 42.56.565 permits an injunction when a public records request endangers the safety of DOC personnel, DOC facilities, or any person. DOC contends that Mario Noyola's public records request endangered the safety of all three. Nevertheless, DOC submitted no direct evidence of any endangerment. DOC did not identify any particular photo or page that threatens security or explain how production of the DOC would threaten someone.

DOC grounds its contention of security on the sole thread that its staff intercepted some of the photographs Jesus Salmeron sent to Mario Noyola. In turn, DOC argues that,

when its staff rejects an incoming electronic message, DOC has already determined that contents pose a risk to the facility. The logical extension of this argument is that any request for JPay records rejected by the mailroom is a quintessential threat to the safety and security of a correctional facility. DOC in essence wants this court to accept its position that some photos threatened security without any evidence to back its position. But we also review agency action de novo. RCW 42.56.550(3).

## CONCLUSION

We affirm the superior court's dismissal of Mario Noyola's PRA suit. We reverse the superior court's entry of an injunction against Noyola precluding him from sending public records requests to DOC. We remand to the superior court to vacate the injunction.

No. 39698-3-III,
*Noyola v. Department of Corrections*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.


I CONCUR:

_____
Lawrence-Berrey, C.J.

No. 39698-3-III

COONEY, J. (concurring) — The majority affirms the superior court's dismissal of

Mario Noyola's complaint for a violation of the Public Records Act (PRA), RCW ch.

42.56 solely because the Department of Corrections (DOC) was not in possession of

communications between Mr. Noyola and David Salmeron.  I agree.  However, I would

also affirm the court's dismissal of Mr. Noyola's complaint because the JPay messages at

issue are not public records within the meaning of RCW 42.56.010(3).

Under the PRA, a "public record" is any writing that relates to "the conduct of

government or the performance of any governmental or proprietary function prepared,

owned, used, or retained by any state or local agency regardless of physical form or

characteristics."  RCW 42.56.010(3).  Here, the JPay messages at issue are

communications between Mr. Noyola and a friend, two private individuals.  Further,

albeit the JPay messages are writings, the messages do not contain information related to

the conduct of government.  Lastly, the JPay messages at issue are not "prepared, owned,

used, or retained" by the DOC.  *Id*.  Instead, the messages are prepared by private

individuals and retained on servers owned by JPay.

_____
Cooney, J.